UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Case No. 1:12-cr-73-1-jgm |
| OMAR RODRIGUEZ, | : | |
| Defendant. | : | |

SUPPLEMENTAL FINDINGS OF FACT
(Doc. 113)

I.   Introduction

Omar Rodriguez pleaded guilty to one count of kidnapping in violation of 18 U.S.C. § 1201(a) and one count of using a firearm during the commission of a kidnapping offense in violation of 18 U.S.C. § 924(c).  On December 16, 2013, the Court sentenced Rodriguez to 262 months' imprisonment.  In determining the guideline sentence, the Court applied a cross-reference to attempted murder.  (Doc. 100, at 84.)

Rodriguez appealed his sentence, arguing the Court improperly applied the cross-reference. (Doc. 98.)  The Second Circuit found the record "includes no express findings regarding Rodriguez's intent," and remanded the case for supplemental factual findings under United States v. Jacobson, 15 F.3d 19, 21-22 (2d Cir. 1994).  United States v. Rodriguez, 595 F. App'x 83, 84 (2d Cir. 2015).  The federal offense of attempted murder requires "a specific intent to kill."  United States v. Kwong, 14 F.3d 189, 194 (2d Cir. 1994).  To justify imposition of an offense level based on attempted murder, a district court must conclude by a preponderance of the evidence the defendant "actually attempted or intended to kill his victim."  United States v. Stroman, 420 F. App'x 100, 105

(2d Cir. 2011). The Court accepted supplemental briefing from the parties (Docs. 117, 118) and now makes findings of fact in support of the application of the attempted murder cross-reference.

II.     Supplemental Factual Findings

The Court makes the following findings of fact based on the Presentence Investigation Report ("PSR"). See United States v. Martin, 157 F.3d 46, 50 (2d Cir. 1998) ("A sentencing court satisfies its obligation to clearly resolve disputed sentencing issues if it indicates, either at the sentencing hearing or in the written judgment, that it is adopting the recommendations of the probation officer in the PSR.") (internal quotations omitted).

In approximately December 2011, Omar Rodriguez separated from his wife, Philisha Rodriguez. At approximately 9:20 p.m. on March 5, 2012, Rodriguez confronted Steven Rodimon and Tina Evans outside their place of work. Rodimon was Philisha's boyfriend. Rodriguez was armed with a pistol and attempted to force Rodimon into his vehicle. A scuffle ensued and Rodriguez shot Rodimon. Once Rodimon was subdued, Rodriguez shot him again. He then forced Rodimon and Evans into the vehicle. At gunpoint, Evans drove Rodriguez through New Hampshire and Vermont for approximately four hours while Rodimon bled in the passenger's seat and requested medical assistance. Rodriguez had telephone conversations with several people during this time, including Philisha and the police. He ultimately surrendered to the police at approximately 2:00 a.m. The Court concludes Rodriguez had the specific intent to kill Rodimon during these events for the following reasons.

First, Rodriguez planned to kill Rodimon with a gun in advance of the kidnapping. A friend of Rodriguez stated he "had been saying he was going to kill himself and kill Rodimon for 'weeks and weeks and weeks.'" (PSR, at 6.) This was because Rodimon was dating Rodriguez's estranged wife. In executing the kidnapping, Rodriguez showed up at Rodimon's place of work shortly after

closing time carrying a gun and wearing latex gloves and a black mask. (PSR, at 6-7.) Rodriguez had planned his attack in advance, lay in wait for Rodimon, and took precautions to avoid leaving evidence.

Second, Rodriguez shot Rodimon at close range three times.[1] (PSR, at 7.) After Rodriguez shot Rodimon during a scuffle, Rodimon asked, "are you kidding me?" Rodriguez then shot Rodimon again at close range, and replied, "do you think I'm kidding now?" (Doc. 100 (H'rg Tr.), at 10.) Rodriguez shot Rodimon with a third bullet as well, though it is unclear if this occurred during the scuffle or after. Rodriguez shot Rodimon in the abdomen, not an extremity. (PSR, at 11.) Although Rodriguez might argue the gun went off by accident during the scuffle, there can be no doubt he subsequently intended to shoot Rodimon at close range to emphasize his seriousness.

Third, Rodriguez drove the injured Rodimon through New Hampshire and Vermont while refusing Rodimon's request to go to a hospital. (PSR, at 7-9.) Given Rodimon was bleeding from multiple gunshot wounds and complaining of severe pain, Rodriguez's refusal to seek medical assistance indicated he intended that Rodimon die in the car from the gunshot wounds. On a call with the police, Rodriguez falsely stated everyone was "fine" in his vehicle in a possible attempt to disguise Rodimon's injuries from those who might help him. (PSR, at 9-10.) This contrasted with an earlier call to a friend, in which Rodriguez stated: "I took care of Steve. There's two holes in him." (PSR, at 6.) By the time Rodimon arrived in the hospital, he had lost between a quarter and a third of his blood volume in his abdomen and was bleeding to death. (PSR, at 11.) Emergency surgery was necessary to save his life, and his condition was so precarious doctors had to stop surgery at points so he could stabilize. (PSR, at 11.)

---

[1] Although the parties only agree on two shots, one shot during the scuffle and one shot after the scuffle, medical evidence establishes Rodimon was shot three times, as he had five entry and exit wounds in his body caused by bullets. (PSR, at 11.)

Rodriguez contends he only intended to hold Rodimon hostage to force his estranged wife to speak with him. (Doc. 117, at 8.) It is difficult to reconcile this theory with Rodriguez's earlier declaration that he was going to kill Rodimon and with his decisions to shoot Rodimon in the abdomen at close range multiple times and deprive him of needed medical treatment for four hours. Although the mere "fact that a deadly weapon was used does not ipso facto prove the specific intent," Kwong, 14 F.3d at 194, firing multiple shots at close range and preventing any mitigation of the damage is sufficient to establish intent to kill. See United States v. Atehortva, 69 F.3d 679, 687 (2d Cir. 1995) (concluding a district could find intent to murder when there was "undisputed evidence that [defendant] repeatedly fired a gun at federal agents from close range"); see also United States v. Muyet, 994 F. Supp. 501, 518 (S.D.N.Y. 1998) (although use of a gun by itself does not prove intent to kill, "only a minimal additional showing of intent is necessary"). Accordingly, the Court finds Rodriguez acted with the specific intent to kill Rodimon.

III.    Sixth Amendment Issue Raised in Post-Appeal Briefing

In post-appeal briefing, Rodriguez contends that under Alleyne v. United States, 133 S. Ct. 2151 (2013), the Sixth Amendment prohibits the Court from making factual findings to support an attempted murder cross-reference under the sentencing guidelines. Alleyne holds "facts that increase mandatory minimum sentences must be submitted to the jury" or admitted by the defendant. 133 S. Ct. at 2163. Because the issue presented, however, does not involve a mandatory minimum sentence or a mandatory maximum sentence, but merely the calculation of non-binding Sentencing Guidelines, Alleyne is inapposite. See United States v. Jacques, 555 F. App'x 41, 49 (2d Cir.), cert. denied, 134 S. Ct. 1957 (2014), reh'g denied, 134 S. Ct. 2869 (2014) (defendant's "Sixth Amendment challenge fails because the district court's drug quantity determination affected only the calculation of non-binding Guidelines, not a statutory minimum or maximum penalty"); United

States v. Cooper, No. 2:11-cr-22-4, 2014 WL 51139, at *9 (D. Vt. Jan. 7, 2014) ("Because the Sentencing Guidelines are advisory rather than mandatory, an application of Sentencing Guideline enhancements that do not increase the statutory maximum or minimum penalty neither implicates nor violate[s] a defendant's Sixth Amendment right to a jury trial.") (internal citation omitted).

IV.     Conclusion

Based on the supplemental factual findings above, the Court finds Rodriguez's actions demonstrate he had the specific intent to kill Rodimon. Furthermore, Rodriguez's argument the Sixth Amendment prohibits the factual findings requested by the Second Circuit fails because the Guidelines do not have the same binding force as mandatory minimum penalties.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 29th day of May, 2015.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge